John Whitfield (TN 33123)
Gregory F. Coleman (TN 14092)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
800 S. Gay Street, Suite 1100
Knoxville, Tennessee 37929
Tel.:   865-247-0080
Email: jwhitfield@milberg.com
         gcoleman@milberg.com

*Additional Attorneys on Signature Page*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## WINCHESTER DIVISION

| | |
|---|---|
| DAVID UNDERWOOD, individually and on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DEERE & CO. (d/b/a JOHN DEERE),<br><br>Defendant. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

**TABLE OF CONTENTS**

I.     NATURE OF THE ACTION .................................................................. 1

II.    JURISDICTION AND VENUE ............................................................. 4

III.   PARTIES ................................................................................................ 5

   A.   Plaintiff .............................................................................................. 5

   B.   Defendant & Co-Conspirators ......................................................... 5

IV.   FACTUAL ALLEGATIONS ................................................................. 6

   A.   Deere & Co. Background ................................................................. 6

   B.   Deere Tractor Technology ................................................................ 8

   C.   Decades-Long Strategy of Consolidation has Drastically Reduced Competition Among John Deere's Dealerships ............................................ 11

   D.   The "Right to Repair" Movement and Deere's Failure to Provide its Promised Full Spectrum of Repair Tools ......................................... 16

   E.   Deere's Current Diagnostic and Repair Tools Are Insufficient ...................................... 24

   F.   Deere has No Legitimate Basis to Restrict Farmer Access to Necessary Repair Tools . 27

   G.   Deere's Monopolization of the Deere Repair Services Market Has Reaped Supracompetitive Profits and Record Profits for the Company ...................................... 29

V.    TRADE AND COMMERCE .................................................................. 30

VI.   RELEVANT MARKETS ....................................................................... 31

   A.   Deere Repair Services Market .......................................................... 31

   B.   Deere Software Market .................................................................... 32

   C.   Tractor Markets ................................................................................ 32

VII.  ANTITRUST INJURY .......................................................................... 32

VIII. CLASS ACTION ALLEGATIONS ...................................................... 33

IX.   CLAIMS FOR RELIEF ......................................................................... 36

X.    PRAYER FOR RELIEF ........................................................................ 47

XI.   JURY TRIAL DEMAND ....................................................................... 48

Plaintiff David Underwood ("Plaintiff"). on behalf of himself and all others similarly situated, by and through his attorneys, brings this complaint against defendant Deere & Co (d/b/a John Deere) ("Deere" or "Defendant"), based upon personal knowledge as to himself and his own acts and experiences, and as to all other matters, upon information and belief, including investigation of counsel.

## I.      NATURE OF THE ACTION

*"John Deere Promised Farmers It Would Make Tractors Easy to Repair. It Lied."*[1]

1.      Plaintiff brings this action on behalf of himself and as a class action seeking damages and equitable and injunctive relief on behalf of all persons and entities residing in the United States who, during the Class Period of February 3, 2018 to the present, purchased repair and maintenance services for Deere brand agricultural equipment with onboard central computers known as electronic control units ("ECUs") from Defendant or Deere's authorized Dealers and/or technicians.

2.      Farmers have always held a crucial place in the American economy, heavily dependent on the reliability of their farming equipment. In the $68 billion market for agricultural equipment, John Deere is undeniably the largest player in agricultural machinery market in the United States — responsible for over half of all U.S. farm machinery sales, selling twice as much

---

[1] Jason Koebler & Matthew Gault, *John Deere Promised Farmers It Would Make Tractors Easy to Repair. It Lied*, VICE / MOTHERBOARD (Feb. 18, 2021), https://www.vice.com/en/article/v7m8mx/john-deere-promised-farmers-it-would-make-tractors-easy-to-repair-it-lied.

machinery as its two next-largest competitors combined.[2] Deere controls 53 percent of the U.S. market for large tractors and 60 percent of the U.S market for farm combines.[3]

3.      John Deere brand modern agricultural equipment are technologically complex machines, referred to by Deere's Chief Technology Officer as "mobile sensor suites" or "gigantic computers."[4] Essentially, "[a]nything a farmer does on a modern tractor, beginning with opening the cab door, generates messages captured by its main onboard computer, which uploads the signals to the cloud via a cellular transmitter located, in many Deere models, beneath the driver's seat."[5]

4.      While generations of farmers had the right to repair their own farming equipment — or had the option to bring that equipment to an independent mechanic — farmers today are prohibited from accessing the proprietary software and related repair tools (collectively, "Software") that control every aspect of their Deere equipment.

5.      Instead, Deere has unlawfully monopolized the market for repair and maintenance services for Deere brand agricultural equipment with ECUs ("Deere Repair Services"). For the purposes of this litigation, Deere agricultural equipment refers to all John Deere tractors, combines, and other agricultural equipment with ECUs (collectively referred to herein as

---

[2] Peter Waldman & Lydia Mulvany, *Farmers Fight John Deere Over Who Gets to Fix an $800,000 Tractor*, BLOOMBERG BUSINESSWEEK (Mar. 5, 2020) https://www.bloomberg.com/news/features/2020-03-05/farmers-fight-john-deere-over-who-gets-to-fix-an-800-000-tractor.

[3] *Cheat to Win: The John Deere Story*, AMERICAN ECONOMIC LIBERTIES PROJECT (Oct 14, 2021), https://www.economicliberties.us/our-work/cheat-to-win-the-john-deere-story/

[4] Nilay Patel, *John Deere Turned Tractors Into Computers — What's Next?* THE VERGE (Jun. 15, 2021) https://www.theverge.com/22533735/john-deere-cto-hindman-decoder-interview-right-to-repair-tractors

[5] Waldman & Mulvany, *supra* n.2.

"Tractors"). "The[se] software barriers create corporate monopolies — and destroy the agrarian ethos of resiliency and self-reliance."[6]

6.     Software is only available to Deere's network of heavily-consolidated independent dealerships ("Dealers" or "Dealerships"). Pursuant to their agreements with Deere, these Dealerships are contractually bound not to sell or provide farmers or repair shops with the necessary software for ECUs and other tools to make repairs and upgrades to Tractors. Deere has effectively created a tying arrangement, whereby Deere customers' initial purchase of Tractors is tied to the purchase of Deere Repair Services.

7.     As a result of prohibiting Tractor owners and independent repair shops from accessing the necessary resources for repairs, Deere and their Dealerships have monopolized the Deere Repair Services Market in the United States for Tractors controlled by ECUs, reaping supracompetitive profits from Deere Repair Services every time a piece of farming equipment requires the Software to diagnose or make a repair.

8.     Deere stifles competition in the repair market by shutting out independent repair shops, thereby reducing customer choice in what would otherwise be a competitive repair aftermarket.

9.     If Deere had operated the Deere Repair Services Market in a competitive market, free of Deere's anticompetitive restraints, then the fees collected from Plaintiff and the proposed Class would have been far lower. Instead, Plaintiff and Class Members have suffered antitrust injury as a direct result of Defendant's unlawful conduct, paying supracompetitive prices for Deere Repair Services during the Class Period that far exceeded the amount they would have paid if prices had been determined by a competitive market.

---

[6] *Id.*

10.     Accordingly, Plaintiff, on behalf of himself and a class of persons and entities similarly situated, brings this antitrust class action pursuant to Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2). Plaintiff seeks declaratory and injunctive relief, treble and exemplary damages, costs, and attorneys' fees.

## II.     JURISDICTION AND VENUE

11.     Plaintiff brings this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), to secure injunctive relief against Defendant for violating Sections 1 and 2 of the Sherman Antitrust Act (15 U.S.C. §§ 1 and 2), and to recover actual, compensatory, trebled, and other damages for injuries caused by the Defendant's unlawful conduct.

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

13.     This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because there are over 100 members of the proposed Class, the parties in this action are of different domiciles, and there is over $5,000,000 in damages, exclusive of costs and interest.

14.     Venue is appropriate in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. § 15(a) and 28 U.S.C. § 1391(b), (c) and (d) because Plaintiff is located in this District, the Defendant is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

15.     Defendant's activities, as described in this complaint, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

### III.    PARTIES

#### A.    Plaintiff

16.    Plaintiff David Underwood, a full-time farmer who resides in Tennessee, owns Deere agricultural equipment, including Tractors. During the Class Period, Plaintiff purchased Deere Repair Services in Tennessee from a Deere Dealership to diagnose and repair Tractor issues. Plaintiff's Tractors required numerous repairs and he incurred multiple repair bills. Plaintiff suffered antitrust injury as a result of Defendant's conduct alleged herein.

#### B.    Defendant & Co-Conspirators

17.    Defendant Deere & Co. (d/b/a John Deere) is a publicly-traded company headquartered in Moline, Illinois. Among its products and services offered, Deere manufactures agricultural machinery and heavy equipment. Deere also provides Deere Repair Services at issue in this litigation.

18.    "Defendant" as used herein, includes, in addition to Deere, all of the named Defendant's predecessors, including companies that merged with or were acquired by Defendant, as well as Defendant's wholly-owned or controlled subsidiaries, dealerships, affiliated and/or authorized technicians, and/or co-conspirators that sold Deere Repair Services in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States during the Class Period.

19.    Co-Conspirators include independently owned Dealerships that have agreements with Deere. giving the independently owned Dealerships the right to sell Tractors and Deere Repair Services. Based on recent data, out of the 1,544 Dealerships affiliated with Deere, 91% of these Dealerships are owned by a "Big Dealer," *i.e.,* a dealer that owns five or more individual locations,

leaving only 144 stores not part of a large organization.[7] The largest Dealership groups include Ag-Pro Companies, United Ag & Turf, C&B Operations, Papé Machinery, RDO Equipment, Brandt Holdings, Greenway Equipment, Van Wall Group, Quality Equipment, and TriGreen Equipment.

## IV.     FACTUAL ALLEGATIONS

### A.     Deere & Co. Background

20.     Deere agricultural equipment is ubiquitous throughout farming communities in the United States and farmer loyalty to the company is unparalleled. The company's logo (below) has become so recognizable it is memorialized on shirts, hats, and even as tattoos.



21.     According to Deere's 2021 Annual Report filed with the Securities and Exchange Commission ("SEC"), the company is divided into four major business segments:

> The *production and precision agriculture* segment defines, develops, and delivers global equipment and technology solutions to unlock customer value for production-scale growers of large grains, small grains, cotton, and sugar. The segment's main products include large and certain mid-size tractors, combines, cotton pickers, sugarcane harvesters and loaders, and soil preparation, seeding, application, and crop care equipment.
>
> The *small agriculture and turf* segment defines, develops, and delivers global equipment and technology solutions to unlock customer value for dairy and livestock producers, high-value crop producers, and turf and utility customers. The segment's primary products include certain mid-size and small tractors, as

---

[7] Kim Schmidt, *Is There Life Beyond Deere?*, FARM EQUIPMENT (May, 26, 2021) *https://www.farm-equipment.com/blogs/6-opinions-columns/post/19394-is-there-life-beyond-deere*

well as hay and forage equipment, riding and commercial lawn equipment, golf course equipment, and utility vehicles.

The *construction and forestry* segment defines, develops, and delivers a broad range of machines and technology solutions organized along the earthmoving, forestry, and roadbuilding production systems. The segment's primary products include crawler dozers and loaders, four-wheel-drive loaders, excavators, skid-steer loaders, milling machines, and log harvesters.

The products and services produced by the segments above are marketed primarily through independent retail dealer networks and major retail outlets, and, as it relates to roadbuilding products in certain markets outside the U.S. and Canada, primarily through Company-owned sales and service subsidiaries.

The *financial services* segment primarily finances sales and leases by John Deere dealers of new and used production and precision agriculture, small agriculture and turf, and construction and forestry equipment. In addition, the financial services segment provides wholesale financing to dealers of the foregoing equipment, finances retail revolving charge accounts, and offers extended equipment warranties.[8]

22.    In the first nine months of 2021, Deere recorded its highest profits in its history[9] — despite COVID-related supply chain issues and decreased consumer spending, and a dearth of semiconductor chips that most computer infrastructures require to function. Deere Chief Executive Officer, John May, stated that company earnings were positive, despite the fact that Deere was "enduring significant supply chain pressures."[10]

---

[8] Oct 31, 2021 10-K at 82, *supra* n.4.
https://s22.q4cdn.com/253594569/files/doc_downloads/2022/1/de-20211031x10k.pdf

[9] Donnelle Eller, *Deere says last 9 months of earnings already have beat full-year profits record set in 2013*, DES MOINES REGISTER (Aug. 20, 2021),
https://www.desmoinesregister.com/story/money/agriculture/2021/08/20/deere-annual-profits-record-broken-three-months-left-go/8209000002/.

[10] *Id.*

23.    Deere reported that "each quarter [in 2021] has set new quarterly earnings records. The company earned $1.2 billion in the first quarter [of 2021] and nearly $1.8 billion in the second quarter [of 2021]."[11]

24.    Deere remains so profitable, in large part because of its revenue from its monopolization of Tractor repairs — the basis for this action. "Farmers need to keep aging equipment running: that helped increase annual parts sales by 22%, to $6.7 billion, from 2013 to 2019, while Deere's total agricultural-equipment sales plunged 19%, to $23.7 billion."[12]

25.    Deere's repair services department is three to six times more profitable than its sales of original equipment to purchasers of that equipment.[13]

## B.    Deere Tractor Technology

26.    Deere's Chief Technology Officer, Jahmy Hineman, was asked during an interview whether he saw a tractor, combine or construction equipment as "gigantic computers that have big mechanical functions as well[,]" Hineman responded:

> They absolutely are. That's what they've become over time. I would call them mobile sensor suites that have computational capability, not only on-board, but to your point, off-board as well. They are continuously streaming data from whatever it is — let's say the tractor and the planter — to the cloud. We're doing computational work on that data in the cloud, and then serving that information, those insights, up to farmers, either on their desktop computer or on a mobile handheld device or something like that.[14]

---

[11] *Id.*; *see also* John Deere, *2Q 2021 News Release and Financials*, https://s22.q4cdn.com/253594569/files/doc_financials/2021/q2/2Q_2021_News-Release-and-Financials.pdf; *John Deere, 1Q 2021 News Release and Financials*, https://s22.q4cdn.com/253594569/files/doc_financials/2021/q1/1Q_2021_News-Release-and-Financials.pdf

[12] Waldman & Mulvany, *supra* n.2.

[13] *Id.*

[14] Patel, *supra* n.3.

27.     Deere Tractors are technologically complex and run firmware that is essential in order for the machinery to perform even the most basic functions. Tractors cannot operate without the code that runs the internal engine and transmission components, which is necessary for Tractor functioning.

28.     Tractors contain an electronic control unit (previously referred to as "ECU") which "is an embedded system that controls one or more electrical systems or subsystems[.]"[15] The ECU determines how and whether the Tractor functions. There are various types of ECUs, including the engine control unit, the combined power transmission control unit, the transmission control unit, the brake control unit, the central control module, the central synchronization module, the main electric module, and the suspension control module.[16] Collectively, these systems comprise Tractor computer hardware — a system of several computers.[17] Tractors can include up to 80 ECUs.[18]

29.     Within each ECU is the software which makes the specific ECU run and each software differs "according to quantity, complexity and sophistication."[19]

30.     Tractors are outfitted with computer sensors which are constantly monitored by the ECU. "There [are] unique pieces of information that are coming in and routinely building to overall ecosystems of data that they have at their disposal."[20] When one of these sensors notices an error

---

[15] *John Deere Control Modules, Units – ECU, ECM*, HEAVY EQUIPMENT SPARE PARTS, https://en.hespareparts.com/news/systems/john-deere-ce/jd-ce-electrical-parts/jd-ecu-ecm/ (last accessed Feb. 1, 2022).

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] Patel, *supra* n.3.

(such as a broken part), it reports the error back to the ECU, which then "puts the machine into 'limp mode.' This allows farmers to move the machine slowly but not operate it fully. When the problem is diagnosed and repaired, the error code is cleared and the machine can keep working."[21]

31.     According to U.S. PIRG, a nonprofit consumer advocate group addressing Right to Repair issues, the John Deere S760 combine harvester, for example, contains <u>125</u> different computer sensors. If those sensors begin "throwing" error codes, the combine will not operate, and Deere has refused to make the Software accessible to farmers in order to fix the problem. According to U.S. PIRG Right to Repair advocate, Kevin O'Reilly, "It doesn't matter how industrious they are, what their planting window looks like, or if their tractor goes down right as weather threatens to destroy their crop—modern farming equipment is designed so that farmers need to call the dealership to repair their machines[.]"

32.     Since approximately 2000, Deere began using a Controller Area Network system (also called a "CAN bus" system) in Tractors, an electrical system that allows different parts of the equipment to communicate with each other. According to Deere's sales manual, an advantage of the Controller Area Network system is that it "allows the technician at the dealership to plug into the system using the Service ADVISOR computer program. The Service ADVISOR program links up to the tractor's electrical system to read the communications between the controllers to determine where the problem is located and how it can be fixed."[22]

---

[21] Koebler & Gault, *supra* n.1.

[22] *See* John Deere & Co Sales Manual, Electrical, CAN bus electrical system (2017), https://www.dot.state.oh.us/Divisions/ContractAdmin/Contracts/PurchDocs/207-19/DeerComp01/6110M%20Product%20Info.pdf.

33.     This means that, even if Tractor owners have the knowledge and skill to fix their own equipment, they cannot do so – they must wait for a Deere authorized service technician with the necessary Software in order to, at the very least, clear the error message.

34.     Additionally, farmers who use Deere Repair Services report losing valuable time waiting for slow service from Dealerships to fix problems, which can lead to loss of crops and revenue. Tractor owners must rely on Deere Dealerships and technicians to travel to where the Tractor is located, which may lead to substantial charges for travel time, or, alternatively, are forced to pay for equipment to be hauled to a Dealership. And the price for repairs through a Dealership can be prohibitively expensive.[23] As of 2021, the reported cost for repair services from Deere or an authorized Dealer have been as high as $180+ per hour, with large and costly additional charges for travel, software, and parts.

35.     Moreover, if the proper Software is not used to replace parts on Tractors, this can result in the "bricking" of the machinery (shutting down due to a computer fault), essentially rendering it useless.[24] After a new part is installed on Tractors, the "Service Advisor" program needs to be connected to the ECU to authorize the new parts. If not authorized by the Software, the Tractor engine will not start. And an owner must pay a Deere technician to authorize the repair and restore the Tractor operation.

### C.     Decades-Long Strategy of Consolidation has Drastically Reduced Competition Among John Deere's Dealerships

36.     Starting in or about 2002, Deere implemented an aggressive strategy that pressured dealerships to consolidate. This means that, in addition to forcing Tractor owners to purchase Repair Services only from Deere, the company increasingly also presents Tractor owners in many

---

[23] Koebler & Gault, *supra* n.1.

[24] Waldman & Mulvany, *supra* n.2.

areas of the country with limited or nonexistent choice of Deere Dealerships from which to purchase those Repair Services. Deere's efforts to force dealerships to consolidate or lose their affiliation with Deere occurred during the same period that it began the widespread installation of ECUs in its agricultural equipment.

37.     While Dealer consolidation took place across all brands of farm equipment in the early 2000s, the strongest push for consolidation came from John Deere in 2002. At that time, Deere introduced its "Dealer of Tomorrow" plan, an initiative which laid out its plan for the future of its dealership network. A memorandum circulated internally at Deere in 2002 put this in plain terms, stating, "How do we get to the point that makes sense and will lead to high performance? We believe the answer in many locations is through continued dealer consolidation. This new dealer structure may consist of 3-5 stores in contiguous trade areas and sales over $50 million."[25]

38.     Additionally in 2002, Deere brought this strategy to its dealerships in a series of meetings in Louisville, Kentucky, informing dealers they should plan on a future in which they would either be a buyer or a seller.[26] Later that year, Deere embarked on a campaign to push its smaller dealers to sell out. In one example, the former owner of a Virginia dealership recounted the experience of receiving letters, emails, and visits from Deere officials almost monthly urging him to either acquire another dealer or cash out.[27] The result of this strategy has been a massive consolidation of Deere Dealerships under a smaller number of owners and a reduction in the number of Deere Dealership locations over the last two decades.

---

[25] Kim Schmidt, *What's Driving Consolidation Among Farm Equipment Dealers*, FARM EQUIPMENT (Aug. 29, 2018) https://www.farm-equipment.com/articles/15963-whats-driving-consolidation-among-farm-equipment-dealers

[26] Ilan Brat & Timothy Aeppel, *Why Deere Is Weeding Out Dealers Even as Farms Boom*, WALL STREET JOURNAL (Aug. 14, 2007) https://www.wsj.com/articles/SB118705668767896842

[27] *Id.*

39.     Accounts of Deere forcing smaller dealerships to sell or shut their doors are commonplace:

a.  In 2009, a former owner of a Deere-affiliated dealership, Roy Dufault, reported to AgWeek, a weekly agricultural newspaper, that representatives from Deere pressured him to sell his small dealership in Fosston, Minnesota. Deere told him that for the large Dealers in the area to continue to grow, Dufault needed to get out of the way, as his dealership was a hindrance to its profitability.[28] Deere's representatives told Dufault that there was no need for a location in Fosston, and that another dealership could cover the trade area remotely. At the time Deere terminated its dealer agreement with Dufault, customers expressed their concern about where they would have their Deere equipment serviced. As of 2021, there is not a Deere Dealership within 20 miles of Fosston, and none within 100 miles that are not owned by a Big Dealer.

b.  In 2013, a single-location Dealership in New Hampshire, R.N. Johnson Inc., had its dealer agreement with Deere canceled after being in business 84 years. The former owner said that this action was part of Deere's corporate philosophy of "eliminat[ing] all the single-location small dealers."[29] After Deere terminated the dealership agreement, customers were forced to rely on a Dealership 60 miles away in Massachusetts to get their Tractors serviced.

---

[28] news@agweek.com, *John Deere leaves a dealer and his customers high and dry*, AGWEEK (Sept. 21, 2009) https://www.agweek.com/news/john-deere-leaves-a-dealer-and-his-customers-high-and-dry

[29] Meghan Foley, *Former John Deere Dealer Closing After 84 Years, Farm Equipment*, FARM EQUIPMENT (Feb. 28, 2013) https://www.farm-equipment.com/articles/8588-former-john-deere-dealer-closing-after-84-years

    c.   Similarly, in 2021, Deere terminated the contract of Tennessee's last remaining single-store Deere dealership, Tri-County Equipment, which had operated as a Deere dealership since 1977. Tri-County Equipment was the only single-store dealership in Tennessee for four years prior to Deere's termination of the agreement. Deere reportedly had specified a single potential buyer for the store, but the dealer chose to operate the store as a non-Deere dealership instead of selling the business.

40.    In the last decade, the industry-wide number of agricultural equipment stores owned by Big Dealers (Dealerships that operate at least five locations) increased by 59%.[30] And while this large degree of consolidation among agricultural stores in general is substantial, Deere is a noticeable outlier in number of affiliated Dealerships owned by Big Dealers. The trend of consolidation has continued. As seen in the chart below, from 2011 to 2018, the number of John Deere Dealers with more than 10 agricultural equipment locations nearly tripled.[31]

| John Deere Dealers with 10+ Ag Equipment Stores | |
|---|---|
| 2011 | 24 |
| 2012 | 40 |
| 2013 | 41 |
| 2014 | 39 |
| 2015 | 42 |
| 2016 | 45 |
| 2017 | 49 |
| 2018 | 61 |

---

[30] 14 Kim Schmidt, *Big Dealers Continue to Get Bigger*, AG EQUIPMENT INTELLIGENCE (Apr. 22, 2021) https://www.agequipmentintelligence.com/articles/4798-big-dealers-continue-to-getbigger

[31] Schmidt, *supra* n.25.

41.     As of 2018, over 83% of John Deere's agricultural equipment dealership locations were operated by Big Dealers, leaving only 259 smaller operations.[32] In 2021, only 144 Dealerships are not owned by Big Dealers – very few single-location dealerships remain.[33]

42.     The trend of consolidation for Deere dealerships from smaller single store dealers to Big Dealers continues to present. In this respect, John Deere stands in contrast to its competitors in the market for Tractors. See the following chart:

| Dealer Network Comparison | | | | |
|---|---|---|---|---|
| All Ag Stores | | 'Big Dealers' – 5+ Stores | | |
|  |  | Owners | Stores | % |
| Deere (Ag) | 1,522 | 99 | 1,263 | 83 |
| Case IH | 815 | 46 | 431 | 53/45* |
| AGCO Brands | 650 | 20 | 206 | 32 |
| New Holland | 875 | 18 | 181 | 21/14* |
| Kubota | 1,260 | 10 | 145 | 13 |
| Total | 6,750 | 188** | 2,052 | 30 |

*Less Titan Machinery & Rocky Mt. Equip.          **Includes 2 shortline-only Big Dealers

[34]

43.     Not only does Deere push its smaller dealers to sell or consolidate, but it exercises immense control over those transactions. For instance, Deere prevents some smaller dealerships from passing on their business to members of their own family.[35] If a single-location dealer wants to sell the business, Deere dictates who the purchaser can be, funneling dealership sales to

---

[32] *Id.*

[33] Schmidt, *supra* n.7.

[34] Schmidt, *supra* n.25.

[35] Brat & Aeppel, *supra* n.26.

preferred Big Dealers. Deere will terminate its affiliation with the dealership altogether if the dealership refuses to sell to the specified buyers.

44.     Deere's consolidation increases the territory controlled by large Dealership groups. This in turn eliminates or reduces the chance of price competition among Deere Dealerships, which can and do charge high prices for Repair Services with little fear of a competitor undercutting their rates.

45.     By decreasing competition among its Dealerships, Deere also increases its own profitability. Deere benefits not only from forcing farmers to purchase Deere Repair Services from Deere Dealerships, but also from forcing farmers to buy these Repair Services in a market that Deere has painstakingly groomed to be less competitive.

**D.     The "Right to Repair" Movement and Deere's Failure to Provide its Promised Full Spectrum of Repair Tools**

46.     The "Right to Repair" movement has grown in recent years due to the increasing wrongful conduct of original equipment manufacturers ("OEMs"). OEMs, who can control warranties and their respective products' ability to be repaired, have seized on this opportunity to deprive consumers of the ability to fully fix and/or repair the equipment that they purchase. This conduct has drawn the scrutiny of federal authorities both in the United States and internationally.

47.     In the United States, the Federal Trade Commission ("FTC") published a report in May 2021 which discussed consumers' "right to repair."[36] This report, which discussed the nuances of OEMs and the legality of tying repair services to the purchase of the products that need

---

[36] Federal Trade Commission, *Nixing the Fix: An FTC Report to Congress on Repair Restrictions* (May 2021) https://www.ftc.gov/system/files/documents/reports/nixing-fix-ftc-report-congress-repair-restrictions/nixing_the_fix_report_final_5521_630pm-508_002.pdf. ("FTC Report").

to be repaired, specifically highlights the "comments and empirical research lamenting protracted repairs for … tractors."[37]

48.    The report proffers testimony that backs up those concerns:

In addition, during the 2016 right to repair hearing held by the Nebraska legislature's Committee on Judiciary, Kenny Roelofsen, a representative of an agricultural replacement company, testified that "if [a tractor is] down for one or two days during planting season or during harvest season, they're wasting money... if the only person who can repair that equipment is the OEM, then if they have a tech that's already out. They don't have another tech to get out there and essentially plug in a USB port and fix their tractor, then they're out. So they're essentially tying up all the market into a monopoly to themselves, not allowing competition which drives prices up."[38]

49.    And, as the report states, "right to repair advocates argue that repair restrictions increase the cost of repair" by OEMs — including Deere.[39]

50.    After the report was submitted to Congress, the FTC voted unanimously to ratify its findings and to "ramp up law enforcement against repair restrictions that prevent small businesses, workers, consumers and even government entities from fixing their own products."[40]

51.    According to the FTC's report, "[m]anufacturer restrictions on aftermarket competition may be subject to claims under Section 1 or Section 2 of the Sherman [Antitrust] Act …."[41]

---

[37] *Id.* at 39.

[38] *Id.*

[39] *Id.* at 40.

[40] Federal Trade Commission, *FTC to Ramp Up Enforcement Against Illegal Repair Restrictions: Commission unanimously adopts policy statement aimed at restoring Right to Repair for small businesses, workers, consumers, and government entities*, (July 2021) https://www.ftc.gov/news-events/press-releases/2021/07/ftc-ramp-law-enforcement-against-illegal-repair-restrictions.

[41] *Id.* at 11.

52.     Additionally, the FTC's report discusses specific types of repair restrictions that "have the effect of limiting consumer repair choices."[42] One such repair restriction is with respect to the intentional unavailability of "diagnostic software and tools."[43] With respect to this type of repair restriction, the report states the following: "[d]iagnostic software and firmware are often necessary today to make repairs because they help repair shops diagnose problems with devices. Repair advocates have indicated that some manufacturers limit the availability of such software and in other instances institute code that prevents [independent repair shops] from developing alternative diagnostic software."[44]

53.     Deere's own actions have hindered the ability of farmers to make repairs, including but not limited to Deere's attempts to restrict customers from accessing the onboard technology on Tractors; and Deere's more recent failure to keep its promise to make certain repair related software, which allows the ECUs in Tractors to function properly, readily available to farmers.

54.     In 2015, Deere argued that the Digital Millennium Copyright Act ("DMCA") forbade consumers from bypassing Technical Protection Measures ("TPMs") when diagnosing or repairing Tractors. Deere argued that farmers only had an "implied license," but did not actually own the software that made the equipment run.[45] The U.S. Copyright Office rejected this argument and deemed the access by farmers to the software, for the purpose of repairing the Tractor, to be fair use.

---

[42] *Id.* at 17.

[43] *Id.*

[44] *Id.* at 19.

[45] Deere & Company, *Long Comment Regarding a Proposed Exemption Under 17 U.S.C. 1201*, https://copyright.gov/1201/2015/comments-032715/class%2021/John_Deere_Class21_1201_2014.pdf (last accessed Feb. 2, 2022).

55.     Not to be deterred by this explicit rejection of its attempts to block farmers of the ability to access software necessary for repairs, in 2016 Deere issued an end-user license agreement ("EULA") for "John Deere Embedded Software" which attempted to, again, block farmers from accessing, reverse-engineering, or modifying the software running on Tractors.[46]

56.     Public awareness and frustration grew with the increasingly prohibitive repair restrictions implemented by OEMs like Deere, and state legislatures began to act.

57.     For example, in 2019 Minnesota proposed a bill that would require manufacturers to "make available, on fair and reasonable terms, documentation, parts, and tools*, inclusive of any updates to information or embedded software*, to any independent repair provider or to the owner of digital electronic equipment manufactured by or on behalf of, or sold by, the original equipment manufacturer for purposes of diagnosis, maintenance, or repair."[47]

58.     As of 2021, twenty-seven states introduced some form of "right to repair" legislation, including many with explicit language regarding embedded software.

59.     On September 7, 2018, feeling the increasing public awareness and impending legislative pressure, the Equipment Dealers Association ("EDA"), a trade and lobbying group that represents John Deere and other manufacturers, made a promise, memorialized in a "Statement of Principles," signed and endorsed by Joani Woelfel (The Far West EDA President and CEO) and Jamie Johansson (President of the California Farm Bureau Federation (CFBF)).[48]

---

[46] Deere & Company, *License Agreement for John Deere Embedded Software*, https://www.deere.com/assets/pdfs/common/privacy-and-data/docs/agreement_pdfs/english/2016-10-28-Embedded-Software-EULA.pdf (last accessed Feb. 2, 2022).

[47] Digital Fair Repair, HF 1138, 91st Leg., 2nd Engrossment (Minn. 2020), https://www.revisor.mn.gov/bills/text.php?number=HF1138&type=bill&version=2&session=ls91&session_year=2019&session_number=0. (emphasis added)

[48] *Agreement Streamlines Repair of High-Tech Farm Equipment*, FARWEST EQUIPMENT DEALERS ASSOCIATION (Sept. 7, 2018),

60.     In sum, the EDA committed to make repair tools, software, and diagnostics available to the public by January 1, 2021.[49]

61.     The promise was consummated with a ceremony and photo op taken in the shadow of a John Deere tractor.[50]



---

https://web.archive.org/web/20210220104859/https://fweda.com/2018/09/09/agreement-streamlines-repair-of-high-tech-equipment/ (last accessed Feb. 2, 2022).

[49] *Id.*

[50] *Id.*

62.     The "Statement of Principles"[51] reads in full:

**STATEMENT OF PRINCIPLES:**

To the extent not already available, the maintenance, diagnostic and repair information listed below will be made available to end users through authorized agricultural dealers at fair and reasonable terms, beginning with tractors and combines put into service on or after January 1, 2021. End users will also be able to purchase or lease diagnostic tools through authorized agricultural dealers. Certain information and tools may be available earlier. Agricultural dealers are committed to provide access to:

- Manuals (Operator, Parts, Service)
- Product Guides
- Product Service Demonstrations, Training, Seminars or Clinics
- Fleet Management Information
- On-Board Diagnostics via diagnostics port or wireless interface
- Electronic Field Diagnostic Service Tools and training on how to use them
- Other publications with information on service, parts, operation and safety

Using this information and these tools, which will be available for purchase, lease or subscription from dealers, farmers will be able to identify and repair numerous problems they may encounter with their equipment. FWEDA and CFBF support equipment users' ability to maintain, diagnose and repair their machinery. However, the ability to diagnose and repair does not mean the right to modify. For safety, durability, environmental and liability reasons, diagnostic and repair information and tools will not permit consumers to do the following:

- Reset an immobilizer system or security-related electronic modules,
- Reprogram any electronic processing units or engine control units,
- Change any equipment or engine settings negatively affecting emissions or safety compliance,
- Download or access the source code of any proprietary embedded software or code



This commitment to providing maintenance, diagnostic and repair tools is a reaffirmation of the importance of seeking commonsense solutions to meet farmers' needs. FWEDA and CFBF are eager to continue working together to provide the most innovative and high-quality equipment to meet the needs of modern production agriculture.

**Signed and Endorsed**
*this 7th Day of September, 2018*



CEO, Far West Equipment Dealers Association

President, California Farm Bureau Federation

63.     Jamie Johansson underscored the importance of keeping such a promise stating:

"[r]eliable farm equipment is crucial to the success of any farming operation, and farmers have

---

[51] FWEDA Right to Repair Statement Signed, FARWEST EQUIPMENT DEALERS ASSOCIATION (September 7, 2018), https://www.fweda.com/wp-content/uploads/2018/09/FWEDA-Right-to-Repair-Statement-Signed_090718.pdf (last accessed Feb. 2, 2022).

long depended on their ability to make repairs quickly in order to keep their equipment running during harvest and other key times."[52]

64.     Joani Woelfel commented that the Statement of Principles "says a lot about the relationship between dealers and their customers" and "[i]t is especially important because whenever we can resolve issues that concern us without passing laws, everybody wins."[53]

65.     With the EDA signing the Statement of Principles, companies like John Deere avoided right to repair legislation with an empty promise.

66.     Now, more than three years later, farmers still struggle to see those promises fulfilled as they are denied necessary repair related software as outlined in the agreement with EDA.

67.     Deere has unsurprisingly denied claims that farmers are hindered in any way from repairing their Tractors and has insisted that the promise made in the EDA Statement of Principles has been kept.[54]

68.     In June 2021, John Deere Chief Technology Officer, Jahmy Hindman, stated in response to questions about the allegations that Deere has not made necessary repair tools, including software, available to consumers that "98 percent of the repairs that customers want to do on John Deere [Agricultural Equipment] today, they can do. There's nothing that prohibits them from doing them."[55]

---

[52] *See supra* n.48.

[53] *Id.*

[54] *Id.*

[55] Patel, *supra* n.3

69.    Around that same time, Deere issued a company statement that "John Deere supports a customer's right to safely maintain, diagnose and repair their own equipment."[56] Deere is also quoted as stating "When customers buy from John Deere, they own the equipment and can choose to personally maintain or repair the product."[57]

70.    However, there are plenty of real-world examples that demonstrate how many of the things, including software, as contemplated in the EDA Statement of Principles remains inaccessible to farmers.

71.    For example, in 2020, one owner of an independent equipment mechanic shop in Nebraska reported that about half of the repairs he sees involve code faults triggered by emission-control systems. The faults render vehicles inoperable, or "limp", and while the shop can replace the mechanical equipment that might throw the Tractor's code, the Dealerships would not provide the software necessary to restart the piece of equipment without hauling the machine to a Dealership or paying for Deere mechanic to make a house call.[58]

72.    In February 2021, Right to Repair advocate Kevin O'Reilly, posing as a consumer, called twelve John Deere Dealerships in six states to determine the availability of diagnostic software. Eleven of those Dealerships told Mr. O'Reilly that they don't sell diagnostic software, and the last one gave him an email address to contact and ask for the tools. When Mr. O'Reilly sent an email to the individual identified, he never received a response.[59]

---

[56] Tyne Morgan, *AEM, John Deere Respond to Biden's Planned Executive Order Over Right to Repair Equipment*, AGWEB FARM JOURNAL (July 7, 2021) https://www.agweb.com/news/policy/politics/aem-john-deere-respond-bidens-planned-executive-order-over-right-repair

[57] *Id.*

[58] Waldman & Mulvany, *supra* n.2

[59] Koebler & Gault, *supra* n.1.

73. Mr. O'Reilly published a report highlighting how "[f]armers' inability to repair software-connected systems without proprietary software is a glaring example of how farm equipment is engineered to be dependent on dealership support."[60]

74. Similarly in 2021, journalists inquiring about the availability of software called nine John Deere Dealerships in seven states and were told by representatives that software was not available.[61]

75. If these software related tools were actually available, then it would be simple for Deere to point to where they could be accessed and where they could be purchased.

76. Despite public facing comments implying that farmers need not rely on Dealerships for repairs, Deere has intentionally obscured the fact that the software, and access to it, are necessary for diagnosis and completion of many repairs.

77. Deere's misleading statements fail to provide information on the scope of repairs and maintenance that can be accomplished without access to necessary software, which prevents farmers and others from being able to accurately assess the overall cost of owning Tractors.

**E.     Deere's Current Diagnostic and Repair Tools Are Insufficient**

78. Where Deere has made diagnostic and repair tools available to consumers — like Plaintiff and members of the proposed Class — they are insufficient to cover either the entire scope of what is needed by farmers to make repairs on their Tractors or to restore competition to the Deere Repair Services Market.

---

[60] Kevin O'Reilly, U.S. PIRG, *Deere in the Headlights: How software that farmers can't access has become necessary to tractor repair* (Feb. 2021), https://uspirg.org/feature/usp/deere-headlights.

[61] Koebler & Gault, *supra* n.1

79.     One example is the release of the Customer Service ADVISOR program which debuted on Deere's main website (deere.com) on or around June of 2021.[62]

80.     According to Deere, "Customer Service ADVISOR is a digital database of Operator, Diagnostic, and Technical manuals for John Deere Products. [A Customer Service ADVISOR] subscription allows users to connect machines … to clear and refresh codes, take diagnostic readings, and perform limited calibrations."[63]

81.     However, this subscription is costly (starting at $8,500 for the first year of Customer Service ADVISOR)[64] and the subscription fails to provide the full scope of diagnostic and repair tools needed in order to service a machine — indeed, as per Deere website: it "performs *limited* calibrations."[65] Moreover, "not all of the features that dealers have access to in Service ADVISOR will be available to customers" according to one of the Dealerships.[66] Specifically, the Service ADVISOR program offers:

---

[62] Customer Service ADVISOR, JOHN DEERE, https://www.deere.com/en/parts-and-service/manuals-and-training/customer-service-advisor/ (last accessed Feb. 2, 2022).

[63] *Id.*

[64] *Id.*

[65] Customer Service ADVISOR, UNITED AG & TURF, https://www.unitedagandturf.com/service/customer-service-advisor/ (last accessed Feb. 2, 2022).

[66] *Id.*

| FEATURE | CUSTOMER CAPABILITY |
|---|---|
| Access Owner's and Technical Manuals | Yes |
| Look up diagnostic codes | Yes |
| Machine diagnostic connectivity with EDL | Yes |
| Perform machine calibrations that require EDL | Yes |
| Reprogram Machine Controllers | No |
| Access Dealer Technical Assistance Center | No |
| Utilize Service ADVISOR Remote | No |

[67]

82.     Thus, even if Tractor owners were to subscribe to the Service ADVISOR program, they would not receive the necessary scope of potential diagnostic or repair tools needed to keep their Tractor in working condition.

83.     This further stifles competition in the Deere Repair Services market because, even if farmers or independent repair servicers were to purchase the Service ADVISOR program, they would not receive the full scope of repair and diagnostic services needed.

84.     Dealerships themselves have acknowledged this.

85.     In 2016, a Deere authorized Dealership employee called the Service ADVISOR program "a waste of your money" for farmers and that the Dealership version of the Service

---

[67] *Id.*

ADVISOR program, which has the full scope of repair and diagnostic tools listed above, is "similar… If they let [consumers] calibrate, us dealer guys wouldn't have any work."[68]

**F.      Deere has No Legitimate Basis to Restrict Farmer Access to Necessary Repair Tools**

86.      Deere does not make accessible the same repair information and tools to Tractor owners and independent repair shops as those that are available to Dealers. In so doing, Deere fails to provide the same opportunity for those parties to repair Tractors, as well as fails to foster any real competition in the Deere Repair Services Market.

87.      Deere offers only pretextual reasons why the software and tools available to Dealers are not also equally available to farmers and independent repair shops, including providing access to certain software and repair tools would allow farmers to bypass emissions and safety controls.

88.      Deere misleadingly claims that such restrictions are necessary to "ensure continued compliance with emissions, operator safety and other regulatory requirements."[69]

89.      Deere's Chief Technology Officer put it in the following basic terms:

> We've got a responsibility when we sell a piece of equipment to make sure that it's meeting the regulatory environment that we sold it into. And then I think the other one is in and around safety, critical systems, things that they can impact others in the environment that, again, in a regulated fashion, we have a responsibility to produce a product that meets the requirements that the regulatory environment requires.[70]

---

[68] *JD Service Advisor*, THE COMBINE FORUM, post by hake2651 (Feb. 29, 2016) https://www.thecombineforum.com/threads/jd-service-advisor.253730/.

[69] Deere & Co Position Letter on Kansas HB 2122: Digital Electronic Repair Requirements, SCRIBD, https://www.scribd.com/document/339340098/John-Deere-letter#from_embed (last accessed Feb. 2, 2022)

[70] Patel, *supra* n.3.

90.     In May 2021, as discussed previously, the FTC issued a report that examined, how repair restrictions implemented by various industries increase costs and limit consumer choice, and how these restrictions may implicate federal consumer protection and antitrust laws.[71]

91.     As to Deere's purported concern for safety, the FTC noted that manufacturers, relying upon research submissions and comments from the EDA and AEM,[72] provided no factual support for their statements that "authorized repair persons are more careful or that individuals or independent repair shops fail to take appropriate safety precautions."[73]

92.     Deere's proffered concern that restricting the availability of certain software and tools is necessary to stop customers from overriding emissions controls is similarly unfounded, as the FTC pointed out that data submitted by the EDA, from a 2019 survey, was inapposite, "because [the data] concerns *modifications* to equipment as opposed to *repairs*."[74] The FTC also noted conversations with representatives of the AEM and EDA that confirmed the limitations of the submitted studies.[75]

93.     In addition, there is a clear difference between resetting or clearing an error code in order to get a piece of equipment out of "limp" mode and ignoring or affirmatively overriding emissions or safety codes which requires a completely different set of tools, and are not the same tools used for diagnosis and repair.

---

[71] FTC Report, *supra* n.36.

[72] *Id.* at 37, n.204

[73] *Id.* at 28.

[74] *Id.* at 38. (emphasis added)

[75] *Id.* at 38, n.205.

94.     As Kevin O'Reilly of U.S. PIRG reported, overriding the emission and safety codes on a piece of agricultural machinery, would require the deleting and replacement of the entire operating system of a machine to a version where no such controls were in place.[76]

95.     Additionally, Deere proffers its justification for withholding repair related software from Tractor owners and independent repair shops as necessary to protect its copyright claims to the onboard technology of Tractors under the DMCA.[77]

96.     On October 28, 2015, the U.S. Copyright Office rejected Deere's position, stating "reproducing and altering the computer programs on ECUs for purposes of facilitating diagnosis, repair and modification of vehicles may constitute a non-infringing activity as a matter of fair use[.]"[78]

97.     As illustrated above, there is no defensible basis for Deere to withhold repair related software from a farmer or independent repair shop that is necessary to diagnose or perform repairs.

### G.     Deere's Monopolization of the Deere Repair Services Market Has Reaped Supracompetitive Profits and Record Profits for the Company

98.     Deere and co-conspirator Deere-authorized Dealerships are motivated to maintain their attempted monopolization and monopolization of the Deere Repair Services Market and unlawful tying arrangement as it is tremendously profitable for the company at farmers', other Tractor owners', and independent dealers' expense.

---

[76] O'Reilly, *supra* n.60.

[77] John Deere (2015) Long Comment Regarding a Proposed Exemption Under 17 U.S.C. 1201, https://copyright.gov/1201/2015/comments-032715/class%2021/John_Deere_Class21_1201_2014.pdf

[78] Federal Register, Vol. 80 No. 208 (October 28, 2015), U.S. Copyright Office, *Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies,* Final Rule, at 65954 https://www.govinfo.gov/content/pkg/FR-2015-10-28/pdf/2015-27212.pdf (last accessed Feb. 2, 2022)

99.     As noted above, the Deere Repair Services market is three to six times more profitable than the sales of the original equipment[79] — thus, Deere profits far more from repairs to its Tractors than from the sale of the Tractors themselves. Indeed, at least one fifth of the total sales of Tractors, repairs and services, and other offerings is entirely predicated off of "parts and maintenance services."[80] And from 2013 to 2019, Deere's annual parts sales increased 22%, while the company's total agricultural equipment sales decreased 19% in the same period.[81]

100.    Without proper access to the Software needed to conduct the necessary repairs for their Tractors, farmers have been forced to pay Deere and its Dealerships a premium in order to keep their Tractors running in the event that a part needed to be replaced, or something even as simple as an error message to be cleared. Farmers, like Plaintiff and other members of the proposed Class, operate with thin profit margins — and the supracompetitive prices they're forced to pay to Deere and its Dealerships in the Deere Repair Services market create even more hardship for farmers.

## V.     TRADE AND COMMERCE

101.    During the Class Period, Defendant, directly or through its subsidiaries or affiliated Dealerships, sold Deere Repair Services in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

---

[79] *See supra* n.13.

[80] Rajesh Kumar Singh, *Deere bets on cost cuts, services push to boost profits*, REUTERS (Jan. 8. 2020), https://www.reuters.com/article/us-deere-strategy/deere-bets-on-cost-cuts-services-push-to-boost-profits-idUSKBN1Z72TA

[81] Waldman & Mulvany, *supra* n.2.

102.    During the Class Period, Defendant controlled the entire market for Deere Repair Services in the United States.

103.    Defendant's business activities substantially affected interstate and commerce in the United States and caused antitrust injury in the United States.

## VI.    RELEVANT MARKETS

### A.    Deere Repair Services Market

104.    The principal relevant market to evaluate Defendant's anticompetitive conduct is the Deere Repair Services Market.

105.    The Deere Repair Services Market constitutes various services and labor to repair, maintain, and clear fault codes from Deere Tractors.

106.    There are no available substitutes for Deere Repair Services, and Deere Repair Services are not interchangeable with any other manufacturers' service.

107.    The relevant geographic market is the United States.

108.    Defendant Deere has market and monopoly power in the relevant market through its control over access to the Software.

109.    Any independent repair shops who desire to compete with Deere in the Deere Repair Services Market would face insurmountable barriers. Defendant's effective total control of the Software means that independent repair shops are unable to access the necessary resources to be able to meaningfully compete with Deere. Similarly, any farmers who wish to perform their own repairs and/or maintenance are also unable to access the resources necessary to do so.

110.    Independent repair shops and farmers cannot compete effectively in the Deere Repair Services Market without access to the Software.

### B. Deere Software Market

111. As discussed above, Defendant maintains market and monopoly power over the market for Deere Software. There is no available substitute for Deere Software, and it is not interchangeable with any other manufacturers' product.

### C. Tractor Markets

112. The Deere Repair Services market and the market for Tractors are distinct. The "Tractor Markets" includes, but is not limited to, the United States product markets for agricultural farm tractors, which include 2WD Farm Tractors, Compact Tractors, 4WD Farm Tractors, Row Crop Tractors, Scraper Tractors, Specialty Tractors, Utility Tractors, and Self-Propelled Combines. Defendant Deere is the largest agricultural machinery company in the world and has appreciable economic power in the U.S. Tractor Markets.

## VII. ANTITRUST INJURY

113. Defendant's anticompetitive conduct had the following effects, among others:

    a. Price competition has been restrained or eliminated with respect to Deere Repair Services;

    b. The prices of Deere Repair Services have been fixed, raised, stabilized, or maintained at artificially inflated levels;

    c. Purchasers of Deere Repair Services have been deprived of free and open competition; and

    d. Purchasers of Deere Repair Services, including Plaintiff, paid artificially inflated prices.

114. The purpose of Deere's conduct was to exclude competition and raise, fix, or maintain the price of Deere Repair Services. As a direct and foreseeable result, Plaintiff and the Class paid supracompetitive prices for Deere Repair Services during the Class Period.

115. By reason of the alleged violations of the antitrust laws, Plaintiff and the Class have sustained injury to their businesses or property, having paid higher prices for Deere Repair Services than they would have paid in the absence of Deere's illegal conduct, and as a result have suffered damages.

116. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VIII.   CLASS ACTION ALLEGATIONS

117. Plaintiff brings this action on behalf of himself, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedures, seeking damages and equitable and injunctive relief on behalf of the following class (the "Class"):

> All persons and entities residing in the United States who, during the Class Period of February 3, 2018 to the present, purchased Deere Repair Services for Deere Tractors from Defendant or Deere's authorized Dealers and/or technicians.

118. Specifically excluded from the Class are Deere and its employees, affiliates, subsidiaries, and joint venturers, whether or not named in this Complaint.

119. **Class Identity.** The above-defined Class is readily identifiable and is one for which records should exist.

120. **Numerosity.** Plaintiff does not know the exact number of class members because such information presently is in the exclusive control of Defendant. Plaintiff believes that due to the nature of the trade and commerce involved, there are thousands of Class members

geographically dispersed throughout the United States, such that joinder of all Class members is impracticable.

121. **Typicality.** Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff purchased Deere Repair Services from Defendant, and therefore Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the Class and the relief sought is common to the Class.

122. **Common Questions Predominate.** There are questions of law and fact common to the Class, including, but not limited to:

a. Whether the United States Deere Repair Services Market constitutes a Relevant Market;

b. Whether Deere possesses market power in this Relevant Market;

c. Whether Deere colluded with Co-conspirator Dealerships to suppress competition for Deere Repair Services between Deere Dealerships in violation of Section 1 of the Sherman Act;

d. Whether Deere colluded with Co-conspirator Dealerships to prevent farmers and independent repair shops from having access to the Software in violation of Section 1 of the Sherman Act;

e. Whether Deere illegally tied the sale of Deere Repair Services to Deere Tractors in violation of Section 1 of the Sherman Act;

f. Whether Deere monopolized or attempted to monopolize the Deere Repair Services Market in the United States in violation of Section 2 of the Sherman Act;

g.   Whether Deere engaged in monopoly leveraging by using its monopoly power in the Deere Software Market to gain or attempt to gain or maintain monopoly power in the Deere Repair Services Market in violation of Section 2 of the Sherman Act;

h.   Whether the conduct of Defendant, as alleged in this Complaint, caused injury to the business or property of the Plaintiff and the other members of the Class;

i.   The effect of Defendant's alleged monopolization or attempted monopolization on the prices of Deere Repair Services sold in the United States during the Class Period;

j.   Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief; and

k.   The appropriate class-wide measure of damages.

123.    These and other questions of law or fact, which are common to the members of the Class, predominate over any questions affecting only individual members of the Class.

124.    **Adequacy.** Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class who purchased Deere Repair Services from Defendant and Plaintiff has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Class.

125.    **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged members of the

Class is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

126.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

127.    Plaintiff brings this case on behalf of the Class and all persons and entities similarly situated pursuant to Rule 23, on behalf of all persons and entities that purchased Deere Repair Services that Defendant provided during the Class Period.

128.    Defendant has acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

IX.    **CLAIMS FOR RELIEF**

**COUNT ONE**
**Violation of Section 1 of the Sherman Act**
**Conspiracy in Restraint of Trade**
**15 U.S.C. § 1**

129.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

130. Beginning in or around 2000, Defendant entered into and engaged in unlawful contracts, combinations in the form of trust or otherwise, and/or conspiracies in restraint of trade and commerce with Co-conspirator Dealerships in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

131. Defendant engaged in predatory and anticompetitive behavior by restricting competition among its affiliated Dealerships, which unfairly suppressed price competition for Deere Repair Services and unreasonably restrained trade.

132. Defendant's conduct included concerted efforts, actions and undertakings among Defendant and the Co-conspirator Dealerships with the intent, purpose, and effect of artificially suppressing competition from smaller dealerships.

133. Defendant perpetrated the scheme with the specific intent of reducing competition in the Deere Repair Services market to the benefit of Defendant and the Co-conspirator Dealerships.

134. Defendant's conduct in furtherance of its contracts, combinations and/or conspiracies were authorized, ordered, or done by its respective officers, directors, agents, employees, or representatives while actively engaging in the management of Defendant's affairs.

135. Plaintiff and Class Members paid higher rates for Deere Repair Services from Deere and its Co-Conspirator Dealerships than they otherwise would have in the absence of Defendant's unlawful conduct, and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

136. Defendant's contracts, combinations, and/or conspiracies are per se violations of Section 1 of the Sherman Act.

137.    In the alternative, Defendant is liable under a "quick look" analysis where an observer with a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.

138.    Defendant's contracts, combinations, and/or conspiracies have had a substantial effect on interstate commerce.

139.    As a direct and proximate result of Defendant's contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiff and Class Members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

**COUNT TWO**
**Violation of Section 1 of the Sherman Act**
**Group Boycott**
**15 U.S.C. § 1**

140.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

141.    Beginning approximately in 2000 and continuing thereafter to the present, Defendant, by and through its officers, directors, employees, agents, or other representatives, have explicitly or implicitly colluded with Co-conspirator Dealerships to jointly boycott entities that would have introduced price-reducing sales of Deere Repair Services in the United States, in order to artificially raise, fix, maintain, and/or stabilize prices in the Deere Repair Services market, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

142.    Defendant's and the Co-conspirator Dealerships' refusal to sell Software and repair tools to individual farmers and independent repair shops constitutes a per se violation of Section One of the Sherman Act.

143.     Defendant's and the Co-conspirator Dealerships' boycott cut off access to the Software, a necessary resource that would enable farmers and independent repair shops to compete in the Deere Repair Services market.

144.     Together, Defendant and the Co-conspirator Dealerships wholly control the market for Deere Repair Services.

145.     No plausible pro-competitive arguments exist for Defendant's and the Co-conspirator Dealerships' refusal to sell the Software to farmer or independent repair shops.

146.     As a direct and proximate result of Defendant's contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiff and Class Members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

**COUNT THREE**
**Violation of Section 1 of the Sherman Act**
**Unlawful Tying Arrangement**
**15 U.S.C. § 1**

147.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

148.     This cause of action is brought under Section 1 of the Sherman Act, 15 U.S.C. § 1.

149.     "The typical tying case involve[s] a seller's attempt to exploit its economic power over one product or in one market to force a less desirable, tied product on a buyer." *Courtney Cates, et al. v. Crystal Clear Technologies, LLC*, 874 F.3d 530, 534 (6th Cir. 2017). Such an arrangement violates Section 1 of the Sherman Act if the seller has appreciable economic power in the tying product market and the arrangement affects a substantial volume of commerce in the tied market. *Eastman Kodak Co. v. Image Tech. Servs. Inc.*, 504 U.S. 451, 462 (1992).

150.     Deere Tractors and Deere Repair Services are distinct and separate products and services.

151.     Plaintiff and Class members through their purchase of Deere Tractors were coerced into purchasing a second tied product, Deere Repair Services, from Defendant and its Co-Conspirator Dealerships.

152.     Defendant's aggressive consolidation of its affiliated Co-conspirator Dealerships also materially changed the dynamics of the Deere Repair Services Market, drastically reducing the pressure of pricing competition even among the Dealerships.

153.     Furthermore, Defendant represented to Plaintiffs and the Class that most necessary repair tools were available and that almost all repairs could be done on the Tractors without the Software. These misleading statements meant that Plaintiff and the Class could not, from Deere's representations, engage in accurate lifecycle pricing for Deere Tractors before they were locked into purchasing Deere Repair Services from Defendant and the Dealerships.

154.     As set out above, Defendant has appreciable economic power in the relevant Tractor Markets, *i.e.*, the "tying" markets.

155.     This tying arrangement affected a substantial amount of interstate commerce.

156.     Defendant's conduct amounts to a *per se* tying violation, as Defendant has significant power in the tying markets which has led to a significant and actual impact on competition in the Deere Repair Services market.

157.     Alternatively, Defendant's conduct is illegal tying under the rule of reason, as Defendant's actions to coerce farmers to purchase Deere Repair Services from Defendant is an unreasonable restraint on competition in the market for Deere Repair Services.

158.    There are no legitimate business justifications for Defendant's illegal tying arrangement.

159.    Defendant has a substantial economic interest in sales of Deere Repair Services.

**COUNT FOUR**
**Violation of Section 2 of the Sherman Act|**
**Monopolization**
**15 U.S.C. § 2**

160.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

161.    This cause of action is brought under Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits "monopoliz[ation of] any part of the trade or commerce among the several states, or with foreign nations."

162.    Deere has monopoly power in the Deere Repair Services Market, including the power to control prices and exclude competition.

163.    Deere has willfully and intentionally engaged in anticompetitive conduct in order to unlawfully maintain its monopoly in this market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

164.    Deere has unreasonably restrained, and further threatens to unreasonably restrain competition in the Deere Repair Services Market by:

  a.   restricting the availability of the Software necessary to perform diagnostics and repairs for Deere Tractors;

  b.   knowingly misrepresenting the availability and necessity of the Software necessary for diagnostics and repairs for Deere Tractors;

  c.   tying the purchase of Repair Services through Deere to the purchase of Deere Tractors; and

41

    d.   limiting farmers' rights over their own Tractors through the terms of the EULA with the aim of restricting farmers' ability to choose to perform Deere Repair Services themselves or take their Tractor to an independent repair shop.

165.    While some of these anticompetitive acts themselves constitute an individual antitrust violation on a stand-alone basis, together they support a broader monopolization claim.

166.    As a direct and proximate result of Deere's anticompetitive and monopolistic conduct, Plaintiff and the Class have been damaged by, among other things: (i) the payment of supracompetitive prices for Deere Repair Services; and (ii) the lack of availability of independent Deere Repair Services and self-repair options.

**COUNT FIVE**
**Violation of Section 2 of the Sherman Act**
**Attempted Monopolization in the Alternative**
**15 U.S.C. § 2**

167.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

168.    As detailed above, Deere has monopoly power, or at a minimum, a dangerous probability of success in acquiring monopoly power, in the Deere Repair Services Market, including the power to control prices and exclude competition.

169.    Deere has willfully, knowingly, and with specific intent to do so, attempted to monopolize the Repair Services Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

170.    Deere's anticompetitive conduct alleged herein has been directed at accomplishing the unlawful objective of controlling prices and/or preventing competition in the Repair Services Market. Deere's ongoing anticompetitive conduct presents a dangerous probability that Deere will succeed, to the extent it has not already, in its attempt to monopolize the Repair Service Market.

171.     As a direct and proximate result of Deere's anticompetitive and monopolistic conduct, Plaintiff and the Class have been damaged by, among other things, (i) the payment of supracompetitive prices for Deere Repair Services; and (ii) the lack of availability of independent Deere Repair Services and self-repair options.

**COUNT SIX**
**Violation of Section 2 of the Sherman Act**
**Monopoly Leveraging**
**15 U.S.C. § 2**

172.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

173.     As detailed above, Deere has monopoly power over Deere Software.

174.     Deere has willfully and intentionally used its monopoly power over Deere Software to gain or attempt to gain or maintain monopoly power in the Deere Repair Services Market, specifically, by tying purchases of Deere Tractors to Deere-provided Repair Services through deliberate restriction of access to the full spectrum of Software necessary to run diagnostics, approve repairs, and perform maintenance. Deere's actions cannot be justified on the basis of any legitimate consumer benefit.

175.     Furthermore, Deere also leveraged its monopoly power over Deere Software to effectuate the EULA, limiting farmers' ownership rights over their own Tractors and forcing farmers to purchase Deere-provided Repair Services. The EULA impermissibly restricts farmers' ability to perform Deere Repair Services themselves by prohibiting attempts to reverse engineer, adapt, or otherwise circumvent the Software. Deere threatens that it may terminate the license to the Software—and therefore access to a functional Tractor—if a farmer interacts with the Software in a way that Deere deems to be a violation of the EULA.

176. Deere willfully has acquired or maintained monopoly power by the exclusionary conduct detailed above, rather than through legitimate business acumen, skill, efficiency, or legitimate innovation.

177. As a direct and proximate result of Deere's anticompetitive and monopolistic conduct, Plaintiff and the Class have been damaged by, among other things, (i) the payment of supracompetitive prices for Deere Repair Services; and (ii) the lack of availability of independent Deere Repair Services and self-repair options.

**COUNT SEVEN**
**Violation of Section 2 of the Sherman Act**
**Conspiracy to Monopolize**
**15 U.S.C. § 2**

178. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

179. Beginning approximately in 2000 and continuing thereafter to the present, Defendant, by and through its officers, directors, employees, agents, or other representatives, have explicitly or implicitly conspired with Co-conspirator Dealerships to jointly boycott entities that would have introduced price-reducing sales of Deere Repair Services in the United States, in order to acquire monopoly power in the Deere Repair Services market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

180. Defendant's and the Co-conspirator Dealerships' boycott cut off access to the Software, a necessary resource that would enable farmers and independent repair shops to compete in the Deere Repair Services market.

181.    Deere and the Dealerships have willfully, knowingly, and with specific intent to do so, conspired to monopolize the Repair Services Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

182.    No plausible pro-competitive arguments exist for Defendant's and the Coconspirator Dealerships' refusal to sell the Software to farmer or independent repair shops.

183.    As a direct and proximate result of Deere and the Dealerships' conspiracy to restrain trade and commerce, Plaintiff and Class Members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

**COUNT EIGHT**
**Violation of Sections 1 and 2 of the Sherman Act**
**Declaratory and Injunctive Relief**
**15 U.S.C. §§ 1, 2**

184.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

185.    Plaintiff seeks declaratory and injunctive relief under the federal antitrust laws.

186.    Plaintiff's allegations described herein constitute violations of Sections 1 and 2 of the Sherman Act.

187.    Deere effectuated an illegal tying arrangement and a scheme to restrain trade and monopolize a market.

188.    There is, and was, no legitimate, non-pretextual, pro-competitive business justification for Deere's conduct that outweighs its harmful effect.

189.    As a direct and proximate result of Deere's illegal tying arrangement and anticompetitive scheme, as alleged herein, Plaintiff and the Class were harmed.

190.    The goal, purpose, and/or effect of the tying arrangement and anticompetitive scheme was to prevent competition or self-repair in order to continue charging supracompetitive prices for Repair Services.

191.    Plaintiff and the Class have been injured in their business or property by reason of Deere's antitrust violations as alleged in this Complaint. Their injury consists of paying higher prices for Repair Services than they would have paid in the absence of those violations. These injuries will continue unless halted.

192.    Plaintiff and the Class, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), hereby seek a declaratory judgment that Deere's conduct constitutes a violation of Sections 1 and 2 of the Sherman Act.

193.    Plaintiff and the Class further seek equitable and injunctive relief pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct the anticompetitive effects caused by Deere's unlawful conduct.

## COUNT NINE
### Unjust Enrichment

194.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

195.    Deere has benefitted from the monopoly profits on the sale of Repair Services resulting from the unlawful and inequitable acts alleged in this Complaint. Deere's financial benefit resulting from unlawful and inequitable conduct is traceable to overpayments for Repair Services by Plaintiff and the Class.

196.    Plaintiff and the Class have conferred upon Deere an economic benefit, in the nature of profits resulting from unlawful overcharges and monopoly profits, to the economic detriment of Plaintiff and the Class.

197.    The economic benefit of overcharges and unlawful monopoly profits derived by Deere through Plaintiffs' payment of supra-competitive and artificially inflated prices for Deere Repair Services is a direct and proximate result of Deere's unlawful practices.

198.    The financial benefits derived by Deere rightfully belong to Plaintiff and the Class, as Plaintiff and the Class paid anticompetitive and monopolistic prices during the Class Period, inuring to the benefit of Deere.

199.    It would be inequitable under unjust enrichment principles in the District of Columbia and each of the fifty states for Deere to be permitted to retain any of the overcharges for Repair Services derived from Deere's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

200.    Deere is aware of and appreciated the benefits bestowed upon it by Plaintiff and the Class.

201.    Deere should be compelled to disgorge in a common fund for the benefit of Plaintiff and the Class all unlawful or inequitable proceeds it received.

202.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Deere traceable to Plaintiff and the Class.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class of all others so similarly situated, respectfully requests judgment against Defendant as follows:

203.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and its counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

204. The unlawful conduct herein be adjudged and decreed in violation of Section 1 and Section 2 of the Sherman Act.

205. Plaintiff and the Class recover damages, to the maximum extent allowed, and that a joint and several judgment in favor of Plaintiff and the members of the Class be entered against Defendant in an amount to be trebled to the extent the laws permit;

206. Defendant, its affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct alleged herein, or from engaging in other conduct having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

207. Plaintiff and the members of the Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

208. Plaintiff and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

209. Plaintiff and the members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

## XI.    JURY TRIAL DEMAND

210. Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: February 3, 2022         _/s/ Gregory F. Coleman_
                                John Whitfield (TN 33123)
                                Gregory F. Coleman (TN 14092)
                                **MILBERG COLEMAN BRYSON**
                                **PHILLIPS GROSSMAN, PLLC**
                                800 S. Gay Street, Suite 1100
                                Knoxville, Tennessee 37929
                                Tel.:   865-247-0080
                                Email: jwhitfield@milberg.com
                                       gcoleman@milberg.com

                                Peggy J. Wedgworth*
                                Elizabeth McKenna*
                                John D. Hughes* (admitted only in Michigan)
                                Blake Hunter Yagman*
                                Michael Acciavatti* (admitted only in Pennsylvania)
                                **MILBERG COLEMAN BRYSON**
                                **PHILLIPS GROSSMAN, PLLC**
                                405 E. 50th Street
                                New York, New York 10022
                                Tel.:   212-594-5300
                                Email: pwedgworth@milberg.com
                                       emckenna@milberg.com
                                       jhughes@milberg.com
                                       byagman@milberg.com
                                       macciavatti@milberg.com

                                            *_pro hac vice_ forthcoming

                                **_Attorneys for Plaintiff and the Proposed Class_**

49